UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

Rodney Ryan and Jill Ryan and            )
Fortune & McGillis SC,                   )
                                         )  Case No. 21-CV-449
                                         )  Milwaukee, Wisconsin
            Defendants-Appellants,       )
                                         )  January 13, 2022
     vs.                                 )  1:35 p.m.
                                         )
Branko Prpa, MD LLC,                     )
                                         )
            Plaintiff-Appellee.          )
----------------------------------------------------------------

**TRANSCRIPT OF ORAL ARGUMENTS**
BEFORE THE HONORABLE BRETT H. LUDWIG
UNITED STATES DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff
 Rodney Ryan and Jill Ryan
 and Fortune & McGillis SC:     Steinhilber Swanson LLP
 (Via Zoom)                     By: Clair Ann Richman & Colton
                                Chase
                                122 W Washington Ave - Ste 850
                                Madison, WI 53703-2732
                                Ph: 608-630-8990
                                Fax: 608-630-8991
                                Crichman@steinhilberswanson.com
 For the Defendant
 Branko Prpa MD, LLC:           Husch Blackwell LLP
 (Via Zoom)                     By: Timothy Posnanski
                                511 N Broadway - Ste 1100
                                Milwaukee, WI 53202
                                Ph: 414-978-5791
                                Fax: 414-223-5000
                                Timothy.posnanski@huschblackwell.
                                com

 U.S. Official Transcriber:     SUSAN M. ARMBRUSTER, RMR
 Transcript Orders:             Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1

1

2                    TRANSCRIPT OF PROCEEDINGS

3                 Transcribed From Audio Recording

4                          *    *    *

5          THE CLERK:  Now calling Case No. 21-CV-449, Ryan et al

6    v. Branko Prpa MD LLC.  No appearances in the courtroom.  All

7    appearances via Zoom.  Can we start with appearances for the

8    appellants, please.

9          MS. RICHMAN:  Attorney Claire Ann Resop of Steinhilber

10   Swanson LLP appears on behalf of the Appellants Rodney Ryan and

11   Jill Ryan and Fortune & McGillis SC.  Also in the room with me

12   is Attorney Colton Chase also from Steinhilber Swanson LLP.

13         THE COURT:  Thank you.  Appearances for the appellee.

14         MR. POSNANSKI:  Good morning.  Timothy Posnanski

15   appears on behalf of the Appellee, Branko Prpa MD, LLC.

16         MS. RICHMAN:  If I may correct the record, I said my

17   former name, Claire Ann Resop.  I am Claire Ann Richman now.  I

18   apologize.

19         THE COURT:  I recall maybe I did that once or twice in

20   a past chat.  Good afternoon, counsel.  We're here for oral

21   argument in a bankruptcy appeal.  As I understand the facts and

22   the procedural background, they are as follows.

23         The appellant and debtor and defendant, Rodney Ryan,

24   claims he suffered an injury as a result of his employment on or

25   about August 22nd of 2016.  He reported that injury and made a

 1  worker's comp claim to his employer.  His worker's comp insurer,

 2  West Bend Mutual, reported that claim to the State of Wisconsin

 3  Department of Workforce Development Worker's Comp Division on

 4  September 8th of 2016.

 5          And then on May 9th of 2017, Mr. Ryan through his

 6  counsel, Fortune & McGillis, filed a formal claim for worker's

 7  compensation benefits against his employer.  That claim was

 8  disputed, and there were proceedings.  But prior to a hearing,

 9  the appellant debtor defendant, Mr. Ryan, asserted that his

10  claim amounted to the following; that there was a -- consisted

11  of a claim for $46,067.23 for missed work, $641,863.61 for

12  permanent physical disability and lost earning capacity.  And

13  then $1,073,847.30 for unpaid medical expenses and subrogation

14  interest.

15          Two years later on August 27th of 2019, the debtor,

16  his worker's comp insurer, and his employer agreed to settle the

17  claim through a written settlement or Compromise Agreement.  In

18  that agreement, the employer and insurer agreed to make several

19  payments.  They agreed to make a $150,000 payment to Mr. Ryan;

20  although, there was an agreement that $30,000 of that money was

21  to be paid directly to his attorneys, Fortune & McGillis.  There

22  was also $400,000 that was to be paid to Fortune & McGillis'

23  trust account for disbursement to medical providers and

24  lienholders.

25              And it was also understood that from any balance

1   remaining, Mr. Ryan was to receive 80 percent and Fortune &
2   McGillis to receive 20 percent basically after the medical
3   providers and lienholders, any payments to them.

4        The Compromise Agreement provides it is the full and
5   final comprise, including claims for past and future medical
6   expenses.  The respondent was also to fund a Medicare set-aside
7   account.

8        On September 17th of 2019, Administrative Law Judge
9   Donald J. Duty entered an order approving the Compromise
10  Agreement, and the order incorporated expressly all terms and
11  conditions and limitations in the agreement and ordered that
12  within 21 days, the employer and the insurer were to pay
13  $120,000 to Mr. Ryan, $30,000 to the Attorneys Fortune &
14  McGillis, and $400,000 to the trust account, and the respondent
15  was again to fund a Medicare set-aside account.

16       Less than a month later on October 11th of 2019,
17  Mr. Ryan and his wife filed a Chapter 7 petition in bankruptcy
18  court.  In their bankruptcy schedules, they included a debt to
19  the appellee-plaintiff below, Branko Prpa MD LLC, in the amount
20  of $445,684,000.  They also listed several assets from the
21  worker's comp settlement including $110,000 in a BMO Harris
22  account, $320,000 in counsel's trust account that was later
23  amended to the full $400,000 as well as a $271,000 Medicare
24  set-aside.

25       The debtors also claim $781,000 received from the

1  settlement as exempt.

2  On December 16th of 2019, P-r-p-a -- Branko Prpa,

3  filed an objection to the debtor's claim of exceptions and also

4  filed an adversary complaint challenging the treatment of a

5  portion of the settlement proceeds.  The adversary plaintiff and

6  exemption of Jack Door (sic) sought a declaratory judgment that

7  the $400,000 in the trust account was not property of the estate

8  and was instead funds -- was instead money that was being held

9  in trust for the benefit of medical providers.

10  They objected that the clinical exemptions was invalid

11  because the funds were not property of the estate and in the

12  alternative asked that the bankruptcy court impose a

13  constructive trust.

14  On March 24th of 2021, Bankruptcy Judge Hanan granted

15  Plaintiff's Motion for Summary Judgment concluding that the

16  funds at issue were, in fact, trust funds and not property of

17  the estate.  She also held in the alternative that a

18  constructive trust was appropriate, and she sustained the

19  objection to the claim of exemptions on grounds that the funds

20  were not property of the estate.

21  The debtors filed a notice of appeal on April 8th of

22  last year.  The district court clerk's briefing letter went out

23  on May 6th, and the appeal was fully briefed last summer.

24  On December 7th of last year, the Court set today for

25  oral argument.  We later changed the timing and reset it for

1    video conference due to the latest COVID situation.

2              So that was a long explication of the background, but

3    those are the facts as I understand them as well as the

4    procedural history.  Are there any -- Did I get any of that

5    wrong?  Are there any corrections or updates?  Are there any

6    other things that the parties want to report before we proceed

7    with argument?

8              MS. RICHMAN:  I have nothing further, Your Honor.

9              MR. POSNANSKI:  I do not either, Your Honor.

10             THE COURT:  All right.  So thank you.  As I understand

11   the legal issues on appeal are as follows, whether Judge Hanan

12   committed legal error in concluding that the $400,000 in

13   settlement funds was held in trust for the medical providers

14   such that those funds are not property of the estate.  Also,

15   whether she committed error in concluding that Wis. Stat.

16   § 102.27(1) did not preclude the funds from being considered

17   trust property.  And then finally whether she committed error in

18   alternatively concluding that even if an express trust was not

19   created, a constructive trust should be imposed to take them out

20   of the estate.

21             So those are the issues that I've identified.  I've

22   set aside about an hour for argument today.  You guys can use it

23   as you see fit.  You don't need to use all of it.  Don't feel

24   obligated to, but I'm here really to help you or to listen to

25   what you have to say.  I've read the briefs.  As you can tell,

1    I've gone through the procedural and factual background, and I

2    think I have a handle on it, but I will give you now each a

3    chance to state your case.  I do have a few questions.  I may

4    interrupt from time to time, but I'll let you proceed from

5    there.  And appellants, you can go first.

6        MS. RICHMAN:  Thank you, Your Honor.  Thank you for

7    the curtesy of the Zoom appearance given the circumstances.  I

8    appreciate it.

9        What is really happening here in this case is setting

10   -- that Dr. Prpa is attempting to set precedent of an ability to

11   collect a discharged debt a different way than would otherwise

12   be possible given the current rulings by the bankruptcy judge.

13       This debtor filed what is deemed to be a good-faith

14   bankruptcy filing.  There -- It is not an asset case at this

15   time.  It is not subject to any adversary proceedings regarding

16   discharge or dischargeability by any parties and interest.

17       The debt to Dr. Prpa is discharged.  Dr. Prpa is now

18   arguing that Dr. Prpa should be able to collect the money that

19   was issued under an award by worker's compensation for all

20   medical providers and lienholders and any remaining amount in

21   the account to go to the debtor.

22       I propose that this debt has been discharged, and

23   these funds are appropriately the property of the estate of the

24   debtor and not to Dr. Prpa.  What -- The facts of this make it

25   so clear that it would be inappropriate to award Dr. Prpa --

1   First of all, there's no lien, and there's never been any
2   allegation of a lien.  So despite the fact that it already says
3   lienholders, there are no assertive lienholders or any actual
4   lienholders.  Dr. Prpa is merely a medical provider.  So how do
5   you take a debtor who clearly earns an income level not
6   sufficient to pay a million dollars of medical bills, who has
7   been in litigation over a worker's compensation claim, and walks
8   away with over $800,000 of medical debt and only a maxim of
9   $400,000 left to pay that medical debt and no additional
10  resource to obtain attorney fees under plaintiff's argument for
11  resolution of what happens with that $400,000?

12          What they're proposing happens is that the doctor who
13  spends the most money litigating and asking the Court to give
14  them the funds gets the entirety of the funds of which they
15  would only have 40 percent of.  What typically happens in a
16  worker's compensation case like this outside bankruptcy is the
17  $400,000 is negotiated by the worker's comp attorney to the
18  medical providers entered into settlement, and any remaining
19  funds are split.

20          Because the statute allows 20 percent of attorney fees
21  for monies given to the claimants, the award is given in the way
22  that the order and the settlement were worded in this matter,
23  that the remaining is 80 percent of the claim and 20 percent to
24  the attorney.  To confirm that, the attorney didn't take
25  attorney fees off the portion that was paid to attorney fees.

1    There is a lot of argument and a lot of information in

2    the order talking about relitigating this case, the litigation

3    of this case.  And the real point of this worker's compensation

4    case is it was not litigated.  It was settled.  It was settled.

5    There were no facts.  There was no evidence.  Evidence works

6    differently in worker's compensation administration claims than

7    it works in a civil or a district court or in a state court

8    civil proceeding, but it didn't happen.  This was a settlement.

9    And the settlement was that $400,000 of the award to

10   Ryan Fortune to Ryan went into the trust account of Fortune &

11   McGillis.  A trust account is very clear by the supreme court

12   rules that the -- that the lawyer's duty is to the client.  And

13   as a bankruptcy practitioner to say that the money held in a

14   trust account for a client is not property of the estate flies

15   in the face of all the case law and all of my experience as a

16   bankruptcy practitioner for what happens with money in a trust

17   account.

18   If the money were to be held for the benefit of

19   someone else, what happens is there would be an escrow agreement

20   creating a trust, but doesn't exist.

21   THE COURT:  Ms. Richman, I mean I was in private

22   practice for 20 years.  There were often times where we

23   negotiate a settlement and as part of the settlement, the

24   payment is made to the defense counsel's trust account.  It is

25   supposed to be held there or actually goes to plaintiff

1   counsel's trust account but doesn't go directly to the

2   plaintiffs until the settlement --  until conditions are

3   satisfied whatever, and that money is held in trust.

4           It seems to me that's a pretty common thing, and it's

5   not --  There's almost never a formal escrow agreement that gets

6   negotiated in connection with that.  One of the lawyers simply

7   agrees to hold the settlement funds in trust pending resolution

8   of whatever conditions there are in the settlement agreement.

9   Isn't that really what happened here?

10          MS. RICHMAN:  No, it's not what happened here because

11  the settlement agreement didn't say that X amount of funds were

12  being held in trust for this medical provider and this medical

13  provider and this medical provider.  I liken it more to a

14  personal injury case where a personal injury settlement is based

15  upon a total amount like in this case of missed work, medical

16  bills, and those other damages, and you're given an amount.  And

17  we litigate this in exemptions of which part.  That was related

18  to the part that we can exempt under certain exemption statutes.

19  That's not happening here.  But the entire amount was a worker's

20  comp claim.

21          And contrary to Judge Hannon's decision and contrary

22  to the argument of Dr. Prpa, the worker's compensation statute

23  awards the claim only to certain parties, including Mr. Ryan and

24  including certain identified parties in our briefs.  His wife,

25  his children, his dependents, not his medical providers.  This

10

1  award was to Mr. Ryan.  And it is very common that it is put

2  into this type of a situation in a settlement of what happens

3  with the funds that are held for a medical provider.

4        Now, if Dr. Prpa were coming in and asking for a pro

5  rata share, that might be something different.  In fact, that's

6  what would be the proper thing to do in this case if the funds

7  weren't exempt.  So if the funds weren't exempt, they would sit

8  in this account.  The debtor has an interest in them, and they

9  would become an asset of the bankruptcy estate for the trustee

10 to distribute, and the trustee would distribute them to all of

11 Mr. Ryan's creditors pro rata.  So if this is not an exempt

12 asset, that's what would happen.

13       So for example in a personal injury case when you get

14 a big lump sum for a personal injury case and you can exempt a

15 certain amount of an award for damages for personal injury,

16 different under state, different under federal, add your wild

17 card in, the debtor gets to keep the amount of that award that's

18 exempt, and the rest of the funds get distributed by the trustee

19 to the debtor's creditors.  That's an appropriate system with a

20 government statute enforced right to exemption for debtors to

21 have fresh starts given the circumstances of why they have the

22 money.  It is an appropriate circumstance for a trustee to be

23 paying pro rata to all of the debtor's creditors when there's a

24 million dollars of debt and only $400,000 of an asset.  But if

25 some of that asset is exempt, then that asset is found to be

11

1  allowed to be kept by the debtor despite the fact that these

2  creditors exist because of that, and they get to keep that

3  amount.

4          The statute for personal injury doesn't say you get to

5  keep a wrongful death or a damage's claim or a wild card claim

6  unless you got that money because you incurred medical debt.

7  Well, that always happens.

8          The right thing to happen is that this is property of

9  the estate.  It was in the attorney's trust account for the

10  benefit of the client.  It was awarded to the client and to

11  nobody else under the worker's compensation statute, and it is

12  property of the estate.

13          And then what's property of the estate?  Does it fit

14  one of the exemptions?  And if it does, the debtor gets it.  And

15  if it doesn't, then it's an asset to be distributed by the

16  trustee, not for a medical provider to come say you law firm

17  have a duty to me as a medical provider.  Okay, the lawyer of a

18  law firm also has a duty to the client to pay any remaining 80

19  percent of that client.

20          If this is really what the answer is, how does any law

21  firm honor their duty to pay every medical provider in full?

22  And then was that medical provider really a result of that

23  injury?  Clearly, this was a contested worker's compensation

24  claim or they wouldn't have settled after years of litigation

25  for less than being awarded or getting the award.  So now --

1      THE COURT:  Let me stop you there.  So what would

2  happen if there had been no settlement?  Sort of two different

3  scenarios here.  The first one would be what would happen if

4  there was no settlement and the Ryans declared bankruptcy as

5  they did?  Their worker's comp claim would have been an asset of

6  the estate, correct?

7      MS. RICHMAN:  Yes.

8      THE COURT:  And presumably, there could have been an

9  effort by the Chapter 7 trustee to liquidate that asset and

10  could have litigated that I suppose either probably outside the

11  bankruptcy court.  But if that had happened and then after the

12  bankruptcy was filed there had been a settlement, how would

13  those funds and basically this exact same settlement was

14  reached.  It seems to me that the worker's comp claim by

15  definition includes, you know, it includes funds to cover the

16  injury and then also medical expenses.

17      If this had happened during the bankruptcy, wouldn't

18  the doctors have been entitled to say if this dispute had been

19  litigated post filing, post petition, wouldn't the doctors have

20  been able to come in and say, look, we're entitled to get paid

21  as part of this resolution?

22      MS. RICHMAN:  No different than in a personal injury

23  action.  They do out of the assets of the case for nonexempt

24  assets.  So the question is how much of that claim is subject to

25  the exemption that was claimed in this case?  I assert the

1  exemption should have applied.  This is no different than a

2  personal injury action that exists.  And regardless of the

3  medical bills, the debtor gets to keep the exempt portion.  It

4  can be a bad mesh case.  It can be an employment claim.  But

5  whatever the debtor can exempt out of those claims and my

6  opinion, it could be either or depending upon what the trustee

7  decided is that in this case, the trustee would have decided

8  that, well, that's an exempt claim because it's a worker's comp

9  claim, and that is exempt under the statute and therefore it has

10  no value and it would have been abandoned back to the debtor.

11  But the debts of the medical providers are still discharged.

12        The only time the medical providers end up getting

13  paid is either when they have a claim that's paid through the

14  bankruptcy estate or they have a lien on the proceeds.  There is

15  no lien on the proceeds.  Sometimes there are liens on proceeds

16  in personal injury actions.  That's not true in this case.

17  There is no lien.

18        THE COURT:  So my next question though is so when this

19  was settled, the -- In determining the amount that the insurance

20  company, the worker's comp carrier is going to pay as part of

21  that settlement, they are looking at the medical expenses.  So

22  the amount that they agree to pay out is based on an idea that

23  if they don't settle and they go all the way through trial,

24  they're going to have to pay those medical expenses.

25        Given that, didn't the -- didn't the carrier here and

1    the employer in agreeing to the amount that was paid, weren't

2    they assuming that portions of that money were going to pay off

3    those medical expenses?

4          MS. RICHMAN:  Maybe, but they could have agreed to

5    order it.  They could have ordered exactly who it was paid to.

6    It wasn't ordered that way.  It was paid to the claimant, and

7    medical providers are not claimants.  They are not parties

8    contrary to what was in the opinion and the brief, it is not in

9    the statute.  They are not claimants under the worker's

10   compensation code.  They aren't --

11         (Reporter note:  Audio at 23:13 - 23:58 is missing.)

12         MS. RICHMAN:  We know what the settlement says about

13   the medical bills, but they have no liability.  The carrier has

14   no liability to any of the medical providers, zero.  This is a

15   settlement with the employee only based on --

16         THE COURT:  If this case had gone to trial, they would

17   have had liability to Mr. Ryan based on his liabilities to those

18   medical providers because they have to pay his actual medical

19   expenses plus.  So in determining to pay on the claim, they are

20   looking at those actual bills and including that in their

21   calculation of the loss; isn't that right?

22         MS. RICHMAN:  Yes.  No different than in a personal

23   injury action in valuing the money from a personal injury

24   action.  Just like the medical providers have no claim against

25   the insurance company for those items, they have no claim

1   against the insurance company here, and those debts were

2   discharged.  And our statutes say that you can discharge those

3   debts and our statutes say that certain amount of those

4   recoveries are exempt.  This recovery would have been exempt,

5   but that's not the issue here.  It is property of the estate.  I

6   think it would have been exempt.  They argued it wasn't exempt

7   only on the basis of it being property of the estate.  I believe

8   once it is property of the estate, the exemption clearly

9   applies, and they are out of luck.  That's bankruptcy.  There's

10  no crying in bankruptcy.  The debt is discharged, and that

11  amount is exempt no different than a personal injury or a

12  wrongful death claim that's based upon those kinds of

13  compensatory damages.

14          THE COURT:  So maybe you don't know this.  The timing

15  here, the debtors settled this with their worker's comp lawyer

16  and then filed for bankruptcy less than a month later.  Was the

17  bankruptcy in contemplation at the time they reached the

18  settlement with the carrier and the employer including this

19  language about these funds going to the medical providers?

20          MS. RICHMAN:  Well, number one, Your Honor, I wasn't

21  involved, and I have absolutely no idea.  Number two, I think it

22  is absolutely irrelevant because that analysis would only be

23  relevant as to whether or not this is a bad-faith filing.  I

24  mean, that's a discharge and a dismissal question, not an

25  exemption in a property of the estate question.

1    THE COURT:  I disagree.  We're talking about here

2  interpreting this agreement and what was intended and also the

3  order, and ultimately the order incorporates the agreement.  So

4  what was intended at the time the debtors in entering into this

5  agreement agreed that these funds would go to these medical

6  providers subject to this remainder interest, we can get to

7  later, but that was part of the deal they cut, so their

8  intentions at the time I think are relevant.

9    MS. RICHMAN:  There is no evidence about their

10  intentions.  There are allegations, in my opinion, improper

11  allegations about their intentions in the appeal brief filed by

12  respondent.  There is no evidence that any of it was improper.

13  But as I sit here today and if we want to make assumptions, what

14  do you think is going to happen to a low income wage earner who

15  is liable for over a million dollars who only has $400,000 to

16  pay his medical providers?  I know what happens.  The lawyers

17  start calling the medical providers and say will you take a

18  certain percentage discount?  And guess what?  Certain of those

19  medical providers, particularly the ones who litigate, no, we

20  want the whole thing, we're not taking less.  That's what

21  happened, and that's why we're here.

22    But how can it be bad faith or wrongful intention when

23  you have a settlement and you have over $400,000 of medical debt

24  you can't pay to file bankruptcy?  But I don't know, and there's

25  no evidence in the record of any of that just like there's no

1    evidence in the record about the good faith of the litigant here

2    to accept a pro rata percentage of that award.

3            THE COURT:  Do you agree that Judge Hanan identified

4    the elements to establish an express trust are existence of a

5    trustee, the existence of a beneficiary, and then trust property

6    being held for -- by the trustee for that beneficiary?  Are we

7    in agreement that those are the appropriate elements?

8            MS. RICHMAN:  Yes.

9            THE COURT:  And -- Okay.  Can you give me a little bit

10   more on the debtor's agreement?  How is Wis. Stat. § 102.27(1)

11   relevant?

12           MS. RICHMAN:  102.27(1) is relevant because it says

13   that this award cannot be taken away from them to apply their

14   debts, and the award included the $400,000.  That's the

15   exemption.  That's the creditors can't come in and grab it.  It

16   wasn't directed to be specifically paid.

17           I mean, maybe shame on Dr. Prpa.  He didn't go in and

18   have a specific payment.  I don't know.  I wasn't involved, and

19   it was a settlement, not a litigated case.  But that says nobody

20   can take that money, including somebody with a medical claim.

21   And there's a lot of identification with 102.26(b)(3) (sic)

22   about how funds can be directed.  Yes they can, but the claimant

23   may request.  The claimants didn't request any of that in this

24   case.  That isn't applicable.

25           Dr. Prpa doesn't getting to go in and request that

1  that claim be directed to him, and Dr. Prpa isn't allowed to

2  take those claims and that fund under that exemption in

3  102.27(1).

4  THE COURT:  Didn't Mr. Ryan in essence request that

5  these funds be directed to the medical providers generically,

6  not to anybody specific, when he asked the ALJ to approve the

7  settlement agreement which provides for these payments for that

8  portion of the funds to go to the medical providers?

9  MS. RICHMAN:  I don't know exactly who asked that and

10  how that was negotiated, and I didn't think that that was

11  relevant what was asked.  The order is $400,000 of a claim to

12  Mr. Ryan to be put into the trust account of Fortune & McGillis.

13  A settlement?  Who asked.  It was certainly negotiated.  Who

14  gave in to who what?  I don't think it is relevant.

15  THE COURT:  But by agreeing to that allocation and

16  agreeing to that payment to be made and then asking the judge

17  to -- the ALJ to say, we want you to approve this and bless it

18  and say this is the payment that should be made as of the

19  debtor, hasn't Mr. Ryan asked for that?

20  MS. RICHMAN:  Mr. Ryan has asked for that in his

21  claim.  He hasn't asked for that to be the benefit of Dr. Prpa.

22  He hasn't asked to waive his exemption and rights to those

23  funds.

24  THE COURT:  One last question for you.  With respect

25  to the alternate ruling on the creation of a constructive trust.

1    I'm curious as to what the standard of review for me is on that

2    because it seems to me that the imposition of a constructive

3    trust is equitable.  It's discretionary.  So am I reviewing that

4    for abuse of discretion?  What's the standard of review from the

5    appellant's perspective?

6              MS. RICHMAN:  I understood the standard of review to

7    be an error of law, and I believe that an error of law was made.

8    This was a summary judgment.  This was not after an evidentiary

9    hearing, so it was made as a matter of law not based upon a

10   findings of fact.  There are also many statements in that

11   decision about what would be evidence and what would not be

12   evidence, which I find very flawed because they aren't in

13   accordance with what is evidence in a worker's compensation

14   hearing.

15             For example, there's a situation where Judge Hanan

16   says, well, the medical records can't be evidence put in by

17   Dr. Fortune (sic).  Well, in worker's compensation they can be.

18   In worker's comp as long as they are certified by the medical

19   professional they are admissible, and they were.  Those would

20   have been admissible in the worker's comp.

21             There was not a finding based upon appropriate fact

22   finding or even an evidentiary hearing.  It was summary judgment

23   and therefore I believe that she's wrong as a matter of law,

24   that there's no evidence that a constructive trust was created

25   because there is no evidence of wrongdoing.  And frankly if

1    there was, we're in the wrong -- we're in the wrong claim.  If

2    that's true that there was, this really would be a discharge or

3    dischargeability case, and it's not.

4           THE COURT:  As I understood her ruling on the

5    evidentiary issues, it was that at summary judgment, a party

6    opposing summary judgment or party actually moving for summary

7    judgment has an obligation to present evidence that would be

8    admissible to the Court.  And the fact that --  The fact that an

9    ALJ could take into account other evidence, that's one thing,

10   but you still have to present it to the federal court to the

11   bankruptcy court in a way that is admissible, and that it just

12   wasn't done properly here, just kind of thrown in without proper

13   authentication.  But anyway, we don't need to get bogged down in

14   that.

15          MS. RICHMAN:  I want to say that I think the issue for

16   that though was her basis about you're trying to relitigate the

17   case.  You're having this evidence.  No, that's the point.  This

18   case was never litigated.  There were no findings of fact.

19   There were no evidence.  I think Judge Hanan was wrong as a

20   matter of law to have reviewed it that way with regard to a

21   settlement agreement that had no evidence and had no litigation.

22   As a matter of law that was improper and wrong and not relevant

23   to the matter at hand of whether or not a trust was created.

24          THE COURT:  All right.  I think that's all I had for

25   you.  If you have anything else, you can continue; otherwise, I

1  will turn to Mr. Posnanski.

2      MS. RICHMAN:  I just wanted to point out that if

3  appellant is correct -- Sorry, if we are not correct and if

4  Dr. Prpa can come in and get a court order and demand the entire

5  $400,000, how does that make sense and how does that square with

6  the fact that this is a fiduciary obligation by a law firm to

7  every medical provider that exists as to the Ryans?

8      To me, that result shows us why this is the wrong

9  result, is that Fortune & McGillis cannot have a fiduciary

10  obligation to pay the entire amount to every medical provider

11  that exists with regard to the Ryans and to negotiate that.

12  That was never the intent.  That's not how worker's comp works.

13  That's why the claim goes to Mr. Ryan, and he's provided an

14  exemption for it, and he should be allowed to have his

15  exemption, whatever is allowed by law, in his worker's comp

16  claim, which includes the $400,000 for medical expenses.

17      THE COURT:  One follow up on that.  As I understand

18  Judge Hanan's ruling, this is not a ruling that Mr. Prpa or the

19  LLC, the plaintiff, necessarily gets this entire amount of

20  money.  It is a ruling that this money is not property of the

21  estate, presumably the plaintiff, and any other medical

22  providers that are out there share an interest in the trust

23  funds if there was a trust, and that would be something for --

24  not for the bankruptcy court because it's not property of the

25  estate but something for a state court to address.  Perhaps

22

1    counsel files an interpleader or something like that to

2    determine whose entitled to what portion.  But I don't see

3    anything in Judge Hannon's order -- either of her orders or

4    judgments that either the judgment on the adversary or ruling on

5    the claim of exemptions that rules that this entire set of funds

6    goes to the -- goes to the plaintiff in this case.  Am I wrong

7    on that?

8            MS. RICHMAN:  No, Your Honor.  There is a state court

9    action pending where Dr. Prpa has filed a complaint and is

10   asking for the entirety of the account based upon Judge Hanan's

11   decision.  And in these appeal briefs by Dr. Prpa, they have

12   asserted that it is a violation of fiduciary duty to not ask the

13   bankruptcy court for a stay against them giving them the whole

14   $400,000, so that was brought into the briefs in that matter by

15   Dr. Prpa.

16           THE COURT:  Thank you.  Mr. Posnanski.

17           MR. POSNANSKI:  Thank you, Your Honor.  I have my own

18   thoughts on I guess on how I want to proceed with argument.

19   I've heard a lot of things here, and I think some of them I

20   think the Court has already properly addressed.

21           There were some comments at the outset, and I think

22   throughout the appellant's presentation essentially taking issue

23   with the motives of Dr. Prpa or somehow impugning my client's

24   integrity by proceeding in the manner that we have.

25           You know, this is not an effort to collect a

1   discharged debt.  As the Court noted at the outset, the

2   adversary complaint was filed before any of Mr. Ryan's debts

3   were discharged.  We brought the adversary complaint early on in

4   the proceedings, and so I just can't let that pass without

5   comment.

6           At the outset, Your Honor, I would note a few things.

7   First, I think Judge Hanan's decision and analysis was thorough

8   and well reasoned.  She had even asked for and received and

9   considered supplemental briefing from the parties.  This was not

10  a rash decision.  She had allowed the parties to engage in oral

11  argument as well and even then asked for supplemental briefing

12  after the oral arguments.  She clearly took her time and

13  considered these issues conscientiously.

14          Second, it dawned on me actually preparing for today's

15  proceedings and sometimes as lawyers, we get so into the weeds

16  in our own arguments in the case that somehow you overlook some

17  things.  I think the parties have overlooked something that I

18  think is critical and dispositive here.

19          The defendants have predicated their arguments -- I'm

20  sorry, the appellants have predicated their arguments and

21  defendants below upon 102.27(1) and the protection that it

22  affords.  But I don't see how that is at all applicable here.

23  That section provides that no compensation awarded or paid shall

24  be taken for the debts of the party entitled thereto.

25          I think we've overlooked the simple phrase "be taken".

1    There has never been a taking.  Here, you know, a trust would

2    not have the effect of a taking.  The claimant specifically

3    agreed to set these funds aside for disbursement to medical

4    providers and lienholders.  You noted that, Your Honor, in your

5    questioning of opposing counsel when you asked Ms. Richman,

6    well, didn't Mr. Ryan, the debtor here, agree to this?  And if

7    you look at the Compromise Agreement, he did exactly that.

8            Mr. Ryan signed the Compromise Agreement.  He signed

9    the order asking that the Court then approve the Compromise

10   Agreement instructing that $400,000 be specifically set aside

11   for disbursement to medical providers and lienholders.

12           You know, I think we have to note the interplay, and I

13   think Judge Hanan correct did with 102.26(3)(b)(2), which says,

14   At the request of claimant, medical fees may be awarded out of

15   the payment awarded."  That's precisely what occurred here.

16   Ryan, the claimant, signed the Compromise Agreement and agreed

17   that the order should be entered ordering that $400,000 be paid

18   out for disbursement to medical providers.

19           There's a notion in some of the briefing that the

20   payment must be directed specifically to the medical providers

21   or set out in a specific amount, but that's not set forth

22   anywhere in the statute, and there's no authority that's been

23   provided that in order for those payments to be set aside at the

24   request of claimant that that must be done.

25           With respect to the taken aspect of it.  Dr. Prpa is

25

1   not a general creditor.  He is a medical provider.  That's
2   specifically identified and contemplated by the statutory scheme
3   in 102.26.  There's no charging order here we're seeking to
4   enforce.  There's no garnishment under which we're trying to get
5   at these proceeds.  We haven't seized the funds in an attempt to
6   collect a debt.  They were specifically carved out in the order
7   and the Compromise Agreement.

8          You know, I note that according to appellants, I think
9   we are somehow to derive the intent of the parties by looking
10  outside of the plain language that they saw fit to use in the
11  Compromise Agreement and the order.

12         Throughout the entirety of the proceedings, I think
13  the defendants have, frankly, been all over the map.  I don't
14  necessarily fault Ms. Richman for that because she was not
15  counsel before the bankruptcy court as we were litigating these
16  issues.  But, you know, they took contrary positions before the
17  Court on the summary judgment motion both in their briefing,
18  during oral argument, and then in their supplemental materials.

19         And you know I think if I was in the position, I would
20  certainly hope that the Court would overlook the arguments that
21  they actually made to the bankruptcy court too.

22         Despite originally agreeing, the Compromise Agreement
23  and order were plain and unambiguous.  The defendants reversed
24  course.  They attempted to introduce extrinsic evidence
25  regarding the parties' intent, and they failed to do so in an

26

1  admissible form.  That's what the materials that Judge Hanan

2  addressed in her decision were meant to do.  There wasn't

3  somehow to -- I guess I don't know.  The purpose of her

4  addressing those materials and the reason they were submitted by

5  the appellants was to try and demonstrate what the parties

6  intent actually was because they contended it was different than

7  what was set forth in the plain language of the Compromise

8  Agreement and the order.

9      They then even suggested that the court should

10  correspond with the administrative law judge to understand the

11  meaning of the order that he had entered.  And then amazingly --

12  I really do think this was amazing when it occurred.  I can't

13  really get over it as this case has gone on.  They argued that

14  the bankruptcy court should disregard the plain language of the

15  Compromise Agreement and order because it was just a wink, wink

16  agreement, and the defendants should do what they want with the

17  money and hopefully you negotiate was the direct quote from

18  counsel for Mr. Ryan before the bankruptcy court.

19      He continued in his argument saying, and this is a

20  direct quote.  It's in our appendix at page 326.  "No one in

21  this agreement ever really intended to set any of this money

22  actually aside for the medical providers.  The medical providers

23  only had rights to the extent Mr. Ryan wanted to pay at his

24  leisure."  That's the position they have taken.

25      The funds were -- Mr. Fortune then noted in his

1  briefing that the funds were placed into the FMC Trust Account

2  by coincidence.

3      Now, they have reversed course again on appeal and

4  argued that the plain language doesn't establish a trust.  The

5  one thing that has remained consistent is their insistence that

6  Mr. Ryan somehow has unfettered control of funds and can do what

7  he wants with them even though they sit in his attorney's trust

8  account.  Mr. Ryan certainly has no authority to act on behalf

9  of the firm with respect to funds in the firm's trust account.

10  He can do with these funds as he saw fit.

11      THE COURT:  Mr. Posnanski, let me pose to you the

12  question that I posed to -- one of the questions I posed to

13  Ms. Richman, which is let's assume that the debtors had filed

14  for bankruptcy before the settlement, before there was any sort

15  of agreement.  They made the claim and filed their Chapter 7

16  petition before reaching a settlement.  How would the --  And

17  then how would it have played out differently and what would be

18  the result with respect to your client?

19      MR. POSNANSKI:  If they used the exact same language

20  in the Compromise Agreement and order that they used here, the

21  result should be the same as determined by Judge Hanan.  If it

22  was determined that a lump sum should be paid to Mr. Ryan in

23  resolution of his worker's compensation claim, it should be paid

24  entirely to Mr. Ryan and would be the appropriate subject of an

25  exemption.  That's the entire issue from our perspective, Your

28

1    Honor.

2           Had they used language which was suggested by
3    Mr. Fortune but not supported by the record that this was
4    actually a lump sum payment of $550,000, we wouldn't be here.  I
5    would have no argument.  And so if in the context of those
6    negotiations to follow along Your Honor's questioning of
7    Ms. Richman, if the employer and the insurer agreed to pay the
8    total of $550,000 and separately carved out $400,000 for
9    disbursement to medical providers, it was their expectation that
10   the $400,000 would be used to pay those medical providers, and
11   so I don't see any difference in how this would play out if they
12   had filed bankruptcy before this case had been settled in the
13   way that it was.

14          And you know if --  We did submit actually, it didn't
15   appear to be necessary for the court to reach its decision, but
16   you had asked what the expectation and the assumption was of the
17   insurance company in comprising the claim with Mr. Ryan.  We
18   submitted a sworn declaration by Ms. Joyce Seib from West Bend
19   Mutual Insurance that says exactly that, that it was their
20   expectation and assumption that the $400,000 that they had set
21   aside would be used to pay medical providers.  So that is or was
22   in the record.  Judge Hanan did not determine that that was a
23   reason or a fact that she needed to rely upon, but there is
24   actually evidence of that to address the Court's question.

25          THE COURT:  In some ways that's parol and we go with

1    the language that was agreed to not what somebody says they

2    intended.  The best evidence of their intent is what was

3    actually --

4            MR. POSNANSKI:  I would agree, Your Honor.  Frankly,

5    any consideration of the declaration would be inappropriate

6    given the position that the agreement is clear and unambiguous.

7    From our perspective, there would be no other purpose for

8    including that language in the first instance.

9            And you know, the notion that these funds were always

10   Mr. Ryans and he had discretion to negotiate, satisfy, or

11   discharge them in any way that he saw fit, if everyone

12   understood that these funds belonged to Mr. Ryan and were

13   shielded in their entirety by 102.27, it raises some questions.

14   First, why separately carve out and I indicate that they are for

15   disbursement to medical providers.  Why pay them to the trust

16   account of Fortune & McGillis instead of Mr. Ryan directly?  Why

17   did the parties use that language then?  What purpose did it

18   serve?

19           The appellant's arguments rendered this language

20   meaningless surplusage in the way that it's is included.  It

21   frankly makes no sense to include it if the parties really

22   intended all along that these funds belonged to Ryan and if he

23   chose to negotiate he could.  If he didn't, he didn't have to.

24   He could discharge them if he wanted to.  It is dispelled by the

25   language they actually used, and there's been no explanation or

1    reasonable alternative interpretation that has been offered to

2    explain why that language is in the agreement in the way that it

3    is.

4            THE COURT:  Let me just pause.  So let's assume that

5    they filed for bankruptcy before there was any sort of

6    resolution.  So his worker's comp claim at that point is an

7    asset of the estate, correct?

8            MR. POSNANSKI:  Right.

9            THE COURT:  There's no resolution.  He goes through,

10   gets his Chapter 7 discharge.  Your client's claim would be

11   discharged?

12           MR. POSNANSKI:  My client's claim would be discharged,

13   yes.

14           THE COURT:  And then he could have settled --  Well,

15   he has his worker's comp claim, whatever exemption he applied to

16   it.  Assuming that the trustee pursues it or they abandoned it.

17   You can weigh in on which one of those things that could

18   actually happen, it is speculation.  If they had filed their

19   petition before liquidating this claim, it's property of the

20   estate.  Your client would be out of luck if they got through

21   discharge.  And then any settlement that he got on that claim if

22   it was -- if the estate abandoned it, would be his, right?

23           MR. POSNANSKI:  It depends, Your Honor.

24           THE COURT:  So why is the result different the fact

25   that he settled before the petition?

1    MR. POSNANSKI:  Because the result would not be any

2  different, Your Honor, if they used the same language in that

3  hypothetical resolution agreement as they used here.

4    THE COURT:  So my question or what I'm thinking is

5  that if they had filed for Chapter 7, let's say the trustee

6  abandons this asset back to the debtors, they get their

7  discharge, your client's out of luck, the client has this

8  worker's comp claim against the carrier.  The carrier is

9  probably not going to pay him a ton of money for medical

10  expenses because the medical expenses have been discharged.

11    MR. POSNANSKI:  That may very well be true.  I think

12  that almost gets to the point, you know, my client was chastised

13  for what we were allegedly trying to do here.  Here's the

14  consequence if Mr. Ryan is correct.  The $400,000 that was set

15  aside for payment to medical providers is entirely his.  He gets

16  a win fall.  He doesn't have to pay any of the medical

17  providers.  All their clients have been discharged.  So under

18  the circumstances, I agree with you.

19    Hypothetically if that claim goes to as it's

20  prosecuted and maybe they reach a resolution, I would agree that

21  the employer and the insurance company are likely to

22  significantly reduce any amount of compensation that they would

23  provide to Mr. Ryan for medical expenses knowing that those

24  claims had been discharged.  There would be no purpose, no

25  reason to set aside $400,000 for those payments I guess other

32

1  than maybe they knew those payments still existed and thought

2  those providers should be paid.  I mean under the circumstances,

3  there would be no reason to do so.

4        And so the distinction here is that those claims were

5  still very much alive and out there, and they knew that Mr. Ryan

6  was responsible for them, and they specifically carved out the

7  400,000 for disbursement to medical providers.

8        I think it's hard to say what would happen had they

9  filed bankruptcy first.  I think the likely reality too is that

10  any worker's compensation practitioner in this area will not

11  agree to set things aside.  They are going to proceed with a

12  lump sum agreement I think under most circumstances going

13  forward because again if the payment had been made in a lump sum

14  directly to Ryan, my client would have no legitimate argument

15  here, but that's not what happened.

16        THE COURT:  All right.

17        MR. POSNANSKI:  And I think the bankruptcy court

18  properly found that the language used in the Compromise

19  Agreement order established an express trust for medical

20  providers and lienholders.  The court already identified the

21  three elements.  I don't think there's any dispute as to what

22  the elements of express trust are, and I think all three

23  elements are clearly present here, and the bankruptcy court

24  agreed and even found that they were clearly present here.

25        The order placed Mr. Fortune and his firm in the role

1    of a trustee.  I don't see anything problematic about that.  I

2    don't agree there is somehow some conflict with their

3    responsibility there.  The fact that they didn't then properly

4    fulfill their duties as trustee does not mean they could not do

5    so.

6         The bankruptcy court properly noted the fact that

7    there was absolutely no evidence that Fortune & McGillis or

8    Mr. Fortune ever attempted to negotiate with the medical

9    providers after receipt of the $400,000.

10        The court noted and I would say noted even with

11   emphasis added in its decision that the requirements of Supreme

12   Court Rule 21.15(d)(1), which provides that, "Upon receiving

13   funds or other property in which a client has an interest or in

14   which the lawyer has received notice that a third party has an

15   interest identified by a lien, court order, judgment or

16   contract, the lawyer shall promptly notify the client or third

17   party in writing."  That did not happen.

18        And the Court emphasized the language about the

19   lawyer's duties upon knowledge or receiving notice that a third

20   party has an interest in the funds that have been deposited in

21   the trust account.  It is not correct to say that all funds

22   deposited in a law firm's trust account belong only to clients.

23   Routinely, third parties have rights on those funds and here

24   that is exactly what happened.

25        There is no adversity with respect to the law firm's

1   interest in Mr. Ryan's contingent remainder interest in the

2   funds.  That interest only would arise in the unlikely event

3   that there were funds remaining after disbursement to medical

4   providers.  The disbursement had to come first.

5        Indeed, the order specifically addressed how the

6   remaining funds would then be handled to avoid any conflict

7   between Mr. Fortune and his client's remainder interest after

8   that disbursement had, in fact, occurred.

9        Mr. Fortune had to administer the funds to set

10  aside -- that were set aside for disbursement to the medical

11  providers with the medical providers.  That was his obligation.

12  He was supposed to administer them, manage the funds and figure

13  out how they should be disbursed.

14       Certainly, he was well within his rights to set up a

15  claims procedure, contact the medical providers.  He knew who

16  they were.  It was part of the medical claim -- worker's comp

17  claim that he had submitted, so it's not like they were a

18  mystery.  He could have identified them said these funds had

19  been set aside, asked them to make a claim and indicated there

20  would be a bar date so that if they didn't make at that claim

21  timely, they would not be interested or they could have proposed

22  a pro rata distribution from the beginning, but they didn't do

23  so.

24       The Wis. Stat. § 701.0803 requires trustee to act

25  impartially in investing, managing and distributing the trust

1    properly.  But here, Mr. Fortune opted not to act with respect

2    to the $400,000.

3           The argument that Mr. Ryan could somehow do as he saw

4    fit with the funds contradicts the plain language of the

5    Compromise Agreement and the order.  The $400,000 is identified

6    and made payable to the trust account for disbursement, and that

7    language is important for disbursement.  It's not for settlement

8    for negotiation.  It is to be disbursed to medical providers and

9    lienholders.  There is no discretion left with respect to

10   Mr. Ryan and not even Mr. Fortune, which is what was supposed to

11   happen here.  The language could not be more clear.

12          THE COURT:  Let me add one thing on the contingent

13   remainder piece.  So let's assume that these funds are

14   segregated.  They are in trust for payment to medical providers.

15   And if there's any remainder, obviously, to pay the lawyers and

16   Mr. Ryan their shares.  So what happens now if there is a really

17   good negotiations and $300,000 is enough to satisfy all the

18   medical providers, they were willing to comprise, and there's

19   $100,000 left.  What happens to that now?  Would that not be

20   property of the estate?  Does the Chapter 7 trustee now have the

21   ability to come after it even post discharge?  How does that

22   work?

23          MR. POSNANSKI:  So if there is the remainder that's

24   left over, I think that would be property of the estate.  And I

25   think, you know, first and foremost, which is not really in

1    controversy if that happened outside of the confines of

2    bankruptcy, that $100,000 would be split as set forth in the

3    Compromise Agreement and order, the 80 percent, 20 percent.  If

4    it happened --

5            THE COURT:  Although isn't the --  Here's a question.

6    So isn't the lawyer's share of that, has that been discharged?

7            MR. POSNANSKI:  That's a good question, Your Honor.

8    That's not one I've really given thought to.  I think working

9    through how that process would work, you know, that 20 percent

10   that's still to be paid to the lawyer, I think would fall within

11   the same analysis under 103 --

12      (Reporter note:  No further audio found on this recording.

13      Tape concluded at 59:27.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and
Transcriptionist for the United States District Court for the
Eastern District of Wisconsin, do hereby certify that the
foregoing pages are a true and accurate transcription of the
audio file provided in the aforementioned matter to the best of
my skill and ability.


Signed and Certified May 3, 2022.

/s/Susan Armbruster

Susan Armbruster


                        Susan Armbruster, RPR, RMR
                        United States Official Reporter
                        517 E Wisconsin Ave., Rm 200A,
                            Milwaukee, WI 53202
                        Susan_Armbruster@wied.uscourts.gov